UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

CHRYSTAL DAMERON,

                Plaintiff,          Case No. 2:12-cv-11724
                                       Honorable Nancy G. Edmunds
         v.                  Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

       Plaintiff Chrystal Dameron ("Dameron") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [2].

**I.     RECOMMENDATION**

       For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") conclusion that Dameron was not disabled under the Act is not supported by substantial evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [11] be DENIED; that Dameron's Motion for Summary Judgment [9] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits; and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision

be REMANDED for further proceedings consistent with this Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On August 11, 2008, Dameron filed applications for DIB and SSI, alleging disability as of February 27, 2003. (Tr. 105-15). The claim was denied initially on February 24, 2009. (Tr. 58-69). Thereafter, Dameron filed a timely request for an administrative hearing, which was held on August 17, 2010, before ALJ Michael McGuire. (Tr. 29). Dameron, represented by attorney Jennifer L. Risk, testified, as did vocational expert ("VE") Pamela Tucker. At the hearing, Dameron, through her attorney, amended her alleged disability onset date to April 1, 2006. (Tr. 32). The ALJ also agreed, at the request of Dameron's attorney, to hold the record open for two months following the hearing to permit the submission of additional medical records. (Tr. 52-56). No such additional records were submitted to the ALJ. On October 28, 2010, the ALJ found Dameron not disabled. (Tr. 13-28). Additional medical records were then submitted to the Appeals Council, and on February 22, 2012, the Appeals Council denied review. (Tr. 1-7). Dameron filed for judicial review of the final decision on April 18, 2012.

### B.   Background

#### 1.   Disability Reports

In an August 11, 2008 disability report, Dameron indicated that her ability to work is limited by "[b]ack surgery . . . , 2 herniated discs, dis[c]ectomy, need another back surgery for dis[c]ectomy, closed head injury, bad memory." (Tr. 146). Dameron stated that these conditions limited how much she could sit, stand, lift, and carry, and left her with bad short and long term memory. (Tr. 146). Dameron reported that these conditions first began to interfere with her ability to work in February of 2003, while she was employed as a ramp loader for UPS. (Tr.

146-47).  According to Dameron, these conditions caused her to work fewer hours and restricted her ability to lift, stand, sit, and bend, until she ultimately had to cease working altogether on January 15, 2006.  (Tr. 146).  Dameron reported being treated by several doctors for her back pain; the treatments she received included medication, physical therapy, and surgery.  (Tr. 148-51).  Dameron reported that she was prescribed the following medications:  Motrin 800 and Vicodin (for pain), a TENS unit (for back pain), and Xanax (for period panic or anxiety attacks).  (Tr. 152).  Dameron also reported undergoing several tests including an EMG, MRIs, and x-rays.  (Tr. 152-53).

In an August 26, 2008 function report, Dameron reported that she lives in a house with her family, and that she wakes up in the morning and throughout the night in pain.  (Tr. 163-64).  She indicated that, due to her conditions, she can lift no more than ten pounds, has difficulty climbing stairs, and cannot squat, bend, stand, sit, kneel, or walk for too long.  (Tr. 168).  She reported that she can walk one block, sometimes two, but then needs to stop for five minutes before she can resume.  (Tr. 168).  She has some occasional difficulty dressing and grooming herself.  (Tr. 164).  She tries to do some household chores such as cooking, cleaning, and laundry, but has difficulty due to her back and receives help from her mother and son. (Tr. 163-65).  She cannot do yardwork and cannot walk her dogs.  (Tr. 164-65).  She does not go anywhere on a regular basis, and sometimes drives and shops for groceries, depending on how her back is doing.  (Tr. 166-67).  She also reported difficulties with her short- and long-term memory, as well as with depression, social anxiety, and panic attacks, and stated that that she did not handle stress very well.  (Tr. 168-70).  She reported that she used to love to work, play sports, walk her dogs, and stay active, but her hobbies now are reading, watching television, and doing crafts.  (Tr. 167).

In a March 23, 2009 disability report, Dameron reported that her back has been getting worse every day since her last report, that she had back surgery and is scheduled to have further surgeries, and that she had developed a new condition in her hips. (Tr. 175). She reported that she is seeing a doctor for her head injury and her depression, and that she has been receiving treatment from multiple sources for the pain in her back, hips, and knee. (Tr. 175-76). She reported that she has been prescribed Loricats, Motrin 800, Vicodin, and a TENS unit for the pain in her back, hips, and knee; Cardiosado for muscle spasms; and Xanax and Celexa for her anxiety and depression. (Tr. 177). She reported that it has become harder for her to take care of herself, that she sometimes needs help in the shower, that she cannot get up and down the stairs very often, and that she cannot do housework such as cooking, cleaning, and laundry. (Tr. 178).

### 2.    *Plaintiff's Testimony*

At the hearing before the ALJ on August 17, 2010, Dameron testified that she had surgery on her thoracic spine in March of 2007 but continues to have pain in the thoracic area as well as in her lumbar spine; the pain is constant but varies in intensity. (Tr. 37-40). She rates the pain in her thoracic spine as high as an eight out of ten, and in her lumbar spine as high as a seven. (Tr. 43). Her pain increases with standing, sitting, walking, climbing stairs, lifting, or carrying, and sometimes with "nothing at all." (Tr. 39-40). Dameron also testified that she has pain in her hips that has gotten progressively worse over the past year. (Tr. 41). She testified that she had surgery on her right hip in April of 2010, and has a lateral tear in her left hip on which she is planning to have surgery. (Tr. 37). Prior to the surgery, the pain in her right hip was worse than in her left, but this switched after the surgery; while the surgery helped her right hip, she still has pain there. (Tr. 41-42).

Dameron testified that she has been seeing a doctor at a pain clinic over the past year.

(Tr. 38, 43).  Every three to four months, she has been receiving epidurals for the pain in her thoracic spine, and nerve blocks for the pain in her lumbar spine.  (Tr. 38, 41).  These treatments relieve some of her pain for approximately two to three weeks.  (Tr. 46-47).[1]  Dameron also takes multiple medications for her pain and uses a TENS unit, which helps "[a] little bit once in a while."  (Tr. 40-41).  Lying down or adjusting her position also provides some relief for her pain.  (Tr. 40).  Dameron testified that she has done physical therapy "on and off since 2002" but had sometimes been unable to do it due to difficulties with transportation and soreness.  (Tr. 42).  She did physical therapy while in the hospital after her thoracic spine surgery, but did not need to do it afterward.  (Tr. 42).  She did not do physical therapy after her right hip surgery.  (Tr. 42).

Dameron testified that she lives in a house with her mother, who "helps [her] out a lot." (Tr. 37).  Dameron estimates that she can lift about ten pounds, can carry a gallon of milk for a short period of time if she switches hands, can stand with reasonable comfort for about half an hour, can sit with reasonable comfort for about twenty minutes, and can walk no more than two blocks.  (Tr. 39, 42-43).  She has begun using a cane within the past year to help her walk, when the pain is particularly bad or when she has to be walking for a long time.  (Tr. 45-46).  During her typical day, she watches television, fixes easy meals for herself, and lies down five or six times for an hour or two at a time to relieve her pain.  (Tr. 44-45).  She has difficulty doing household chores:  for instance, it takes her three to four periods of time to load the dishwasher, she can only sweep a floor a little bit at a time, and she can do the laundry but cannot carry the basket.  (Tr. 44).  She drives once in a while, when necessary.  (Tr. 44).  When she goes grocery shopping, a friend helps her carry the groceries.  (Tr. 44).  Stairs pose a "very big problem" for

---

[1] Records regarding Dameron's treatment at the pain clinic and her hip surgery were not in the record before the ALJ at the hearing.  (Tr. 31-32, 38).  The ALJ agreed to hold the record open for two months to permit the submission of these records.  (Tr. 53-56).  No such records were submitted to the ALJ, but subsequently were submitted to the Appeals Council.

her, and some days she cannot go up or down them.  (Tr. 47).  Her mother helps her fix meals, do chores, and manage the stairs.  (Tr. 47).

### 3.      Medical Evidence

#### a.      Treating Sources

##### i.      Michigan Head and Spine Institute

On May 9, 2006, Dameron was seen at the Michigan Head and Spine Institute.  (Tr. 257-59).  An MRI of her lumbosacral spine from January 1, 2006 was reviewed and revealed a normal study.  (Tr. 258).  An EMG of her lower extremities was reviewed and showed a possible right L4-L5 radiculopathy.  (Tr. 258).  Dameron was diagnosed with probable post-traumatic neuropathy of the L4 nerve root; no need was found for surgical intervention, but it was recommended that she see Dr. Henry Tong for conservative therapy.  (Tr. 258-59).

In a report dated February 6, 2007, Dr. Tong stated that he administered an epidural and joint injection to Dameron on May 18, 2006, which temporarily relieved her lower back pain, but that she did not receive further physical therapy until January 16, 2007, due to insurance issues.  (Tr. 256).  He noted that Dameron has pain in her lower back and right lateral thigh, though the pain in the thigh had improved, and that her most painful area is in her thoracic spine.  (Tr. 256).  On Dr. Tong's referral, MRIs of Dameron's thoracic spine (Tr. 250) and lumbar spine (Tr. 251) were taken on February 6, 2007.  The MRI of the thoracic spine revealed mild multi-level degenerative changes, mild degenerative disc disease, and mildly compressive disc herniation at T7-T8 and T9-T10.  (Tr. 250).  The MRI of the lumbar spine revealed small posterior disc herniation at L5-S1 and at L4-L5, and diffuse disc bulging with subtle posterior disc herniation at L3-L4.  (Tr. 251).

In a letter dated February 15, 2007, Dr. Mick Perez-Cruet evaluated Dameron's MRIs

and recommended further evaluation of her condition.  (Tr. 263-64).  He noted that she had had multiple sessions of physical therapy without improvement, and that he discussed with her the possibility of minimally invasive thoracic discectomy.  (Tr. 264).  A February 26, 2007, CT scan revealed multi-level thoracic spondylosis.  (Tr. 248-49).  In a letter dated March 15, 2007, Dr. Perez-Cruet re-evaluated Dameron and indicated her desire to proceed with a left T7-T8 and T9-T10 thoracic microdiscectomy.  (Tr. 262).

Dameron underwent surgery on her thoracic spine on March 30, 2007.  (Tr. 238-246).  In a follow-up visit with Dr. Perez-Cruet on April 10, 2007, Dameron stated that "she is doing well" and that "[s]he has had some improvement in the pain she experienced prior to surgery, although she does still maintain some discomfort in the rib area."  (Tr. 260).  D. Perez-Cruet continued Dameron on muscle relaxers and pain medication, and prescribed a course of physical therapy "which may help relieve some of the discomfort she is experiencing."  (Tr. 260, 273).

### ii.  Preferred Rehabilitation, Inc.

On April 27, 2007, Dameron was seen at Preferred Rehabilitation, Inc., for an initial evaluation regarding her post-surgery physical therapy.  (Tr. 253).  Dameron was scheduled to begin active physical therapy three times a week for four weeks.  (Tr. 254).  Dameron was unable to make her first therapy session due to "excruciating pain" and muscle spasms in her back, but attended a session on May 2, 2007; she was noted to have tolerated the therapy exercises "fairly well with minimal increase in discomfort."  (Tr. 270).  Dameron reported that she had increased soreness and muscle spasms on May 3, and after her session on May 4, it was noted that she had "no new complaints" following the therapy.  (Tr. 271).  At her next session on May 9, 2007, Dameron reported muscle spasms in her middle and lower back that she has treated with medication; it was also noted that she "tolerated increase[d] thera[py] ex[ercises] fairly well

with minimal increase in symptoms post-treatment." (Tr. 272). There is no record of any further physical therapy.

### iii.     City Medical; Dr. Wathek Sakka

On January 30, 2008, Dameron was seen at City Medical for complaints of back pain, anxiety, and panic attacks. (Tr. 278). She was diagnosed with degenerative joint disease and anxiety, and prescribed medication. (Tr. 279). From June through September of 2008, Dameron saw Dr. Wathek Sakka, who also prescribed her medication. (Tr. 281-84).

### v.     Dr. Priti Bhardwaj

Dameron saw Dr. Priti Bhardwaj, an internist, on October 14, 2008, and then again on October 24 and November 11, 2008. (Tr. 356, 354, 352). Dr. Bhardwaj's treatment notes from these visits are not entirely legible, but include a diagnosis of radiculopathy and the treatment of Dameron's conditions with medication. (Tr. 355, 352).

Shortly thereafter, on November 21, 2008, Dameron was seen in the emergency room with a complaint of pain in right side of her back radiating down her right leg and into the right side of her abdomen. (Tr. 294). A physical examination revealed tenderness on the right side of her back, pain with a straight leg raising at 30 degrees, and a limited range of motion in her right hip. (Tr. 295-96). It was also noted that she could ambulate slowly without assistance. (Tr. 297). A CT scan of her abdomen and pelvis was negative, as was an X-ray of her right hip. (Tr. 297). Dameron was diagnosed with right flank and low back pain, and was treated with medication. (Tr. 299).

Dameron next saw Dr. Bhardwaj on December 5, 2008, complaining of pain in her back radiating down her right leg. (Tr. 350). An examination revealed tenderness (Tr. 351), and on Dr. Bahrdwaj's referral, an MRI was taken of Dameron's right and left hips on January 11, 2009,

8

which revealed mild degenerative changes in both hips with a small amount of nonspecific fluid in the left.  (Tr. 358).

In a letter to Dameron's counsel dated March 27, 2009, Dr. Bhardwaj reported that Dameron was under his care for severe hip and lower back pain caused by degenerative discs in both hips and a bulging disc in her lower back.  (Tr. 336).  Dr. Bhardwaj opined that Dameron could not do any type of work for at least one full year due to these conditions.  (Tr. 336).

Dameron next saw Dr. Bhardwaj on July 3, 2009, and on a monthly basis thereafter until June 2010; Dr. Bhardwaj's treatment notes reflect that these visits were largely for check-ups and prescription refills.  (Tr. 346-47, 365-90).  In addition, the notes indicate that on July 31, 2009, Dameron complained of pain in her neck and shoulder (Tr. 387); on August 26, 2009, Dr. Bhardwaj provided a referral for a lumbar epidural steroid (Tr. 385); and on November 18, 2009, Dameron reported that her muscle spasms were getting worse, and Dr. Bhardwaj noted radiculopathy and continued treatment with medication (Tr. 379-80).

Dr. Bhardwaj completed two Multiple Impairment Questionnaires regarding Dameron: one dated July 3, 2009 (Tr. 338-44), and the other dated June 3, 2010 (Tr. 392-99).  Dr. Bhardwaj appears to have provided the same answers on both Questionnaires.[2]  Dr. Bhardwaj diagnosed Dameron with right L4-L5 radiculopathy, osteoporosis in her lumbar spine and in both hips, depression, hypertension, chronic back pain, and multi-level disc degeneration.  (Tr. 338, 392).  He listed her prognosis as fair.  (Tr. 338, 392).  In support of his diagnosis, he identified the following clinical findings and laboratory and diagnostic test results:  L-5 tenderness, thoracic spine tenderness, a painful range of motion in both hips, and an unspecified MRI.  (Tr. 338, 392-93).  Dr. Bhardwaj stated that Dameron suffered constant, daily pain in her back, legs,

---

[2] The record copy of the Questionnaire dated July 3, 2009, is missing its second page.  (Tr. 338-39).

and hips, which was precipitated by lifting, bending, changes in the weather, stress, or lack of medication. (Tr. 339, 393-94). Dr. Bhardwaj estimated that, on a scale of 1-10, Dameron's pain and fatigue were both in the 4-6 range. (Tr. 339, 394). He indicated that he had not been able to relieve the pain with medication without unacceptable side effects, and noted that her current medications make her drowsy. (Tr. 339, 341, 394, 396).

Dr. Bhardwaj indicated that, if Dameron were placed in a normal competitive work environment, her symptoms would likely increase. (Tr. 341, 396). He indicated that Dameron could sit for 0-1 hour and stand or walk for 0-1 hour in an eight-hour day, and that she could not sit, stand, or walk continuously. (Tr. 339, 394). He indicated that Dameron would have to get up and move around every 15-30 minutes and would have to wait another 15 minutes before sitting again. (Tr. 339-40, 394-95). He indicated that Dameron occasionally could lift and carry up to 5 pounds, and that she had significant limitations doing repetitive reaching, handling, fingering, and lifting due to her multilevel degenerative disc disease; he found no limitation in her ability to grasp, turn, and twist objects, and rated her limitations in fine manipulation and reaching as minimal. (Tr. 340-41, 395-96). He indicated that Dameron could not perform a full-time competitive job that required her to keep her neck in a constant position. (Tr. 341, 396). He indicated that Dameron's pain and fatigue would frequently be severe enough to interfere with her attention and concentration, and that her depression contributed to her symptoms and limitations. (Tr. 342, 397). He indicated that Dameron was incapable of even a low level of work stress, and that her impairments were likely to produce "good days" and "bad days." (Tr. 342-43, 397-98). He indicated that Dameron would need to take unscheduled 15-20 minute breaks to rest at unpredictable intervals every 1-2 hours during an eight-hour workday, and that she would likely be absent from work more than three times per month. (Tr. 342-43, 397-98).

10

He indicated that Dameron would need a job that permits ready access to a bathroom, and that her inability to push, pull, kneel, stoop, or bend—as well as her psychological limitations and her need to avoid environmental elements (e.g., wetness, fumes, temperature extremes, etc.)—would affect her ability to work at a regular job on a sustained basis.  (Tr. 343, 398).  Dr. Bhardwaj stated that Dameron's symptoms and limitations were present since the time she came under his care in October of 2008, and opined that she was "permanently disabled."  (Tr. 343, 398).

> b.    *Consultative and Non-Examining Sources*

On January 13, 2009, Dr. J.L. Tofaute, an orthopedic surgeon, examined Dameron at the request of the Social Security Administration.  (Tr. 320-22).  Dameron reported to Dr. Tofaute that she had pain in her back with particular tenderness in the paravertebral muscles of her thoracic spine area and in her upper right buttock, but no particular pain in her lower right buttock or left buttock.  (Tr. 322).  She also described her prior back surgery in 2007, and reported that, when the surgery did not help, she had nerve blocks for pain and/or paresthesias going into her right lower extremity, but not below the knee joint.  (Tr. 320).  She stated that she was planning to have surgery on her lower back in March 2009, and possibly again on her mid-back thereafter.  (Tr. 320).  As to her daily activities, she reported that she is able to lift a gallon of liquid, though it makes her hand shake; she knows how to drive but rarely does so; she is independent in feeding, bathing, and dressing herself; she can stand for 20 minutes before feeling a need to change positions to relieve pain; she can sit for 15-20 minutes with positional changes; she can walk for 30 minutes to 1 hour on a plane surface; she is limited in her ability to sit, stand, bend, stoop, carry, push, or pull; and she avoids stairs whenever possible, but occasionally goes up them one foot at a time.  (Tr. 321, 323).

In his examination, Dr. Tofaute observed that Dameron walked slowly, without a limp or

11

a walking aid; that she could do tandem heel and toe walking, though complained of pain in her back with both; that she could reach her fingertips to mid-leg between the knee and ankle when bending at her waist with her legs extended in front of her, and when she did so, she had "a fair forward curve . . . in the muscles of her lower back, indicating the absence of muscular spasm or any significant limitation of motion"; that she had "a virtually normal range of motion of the thoracolumbar spine"; that she complained that spinal extension or back bending caused her pain, but it was done to 20 of an expected 25 degrees; and that lateral flexion to the left was done to the normal amount and without complaint, but lateral flexion to the right was done to 15-20 degrees of an expected 25 and was said to be painful in her lower back.  (Tr. 321-22).

### 4.    *Vocational Expert's Testimony*

At the hearing before the ALJ, the Vocational Expert ("VE") testified regarding a hypothetical individual of Dameron's age, education, and work history who was able to lift or carry 10 pounds occasionally; who could stand, walk, and sit for six hours in an eight-hour workday provided she could sit and stand at will; who could push or pull 10 pounds; who could not engage in any climbing, crawling, crouching, or kneeling; and who could occasionally engage in other postural activities.  (Tr. 49-50).  The VE testified that such an individual could not perform Dameron's past work, but would be able to work as an electronics worker, an address clerk, and a document preparer.  (Tr. 50).  Such an individual would not be able to perform these jobs, however, if she needed to lie down off and on throughout the day due to pain, or if the individual would be absent from work three times a month.  (Tr. 51-52).

### C.    **Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

13

**D.**    **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Dameron is not disabled under the Act.  The ALJ first found that Dameron met the insured status requirements of the Social Security Act through September 30, 2009, and that she has not engaged in substantial gainful activity since her alleged onset date of April 1, 2006.  (Tr. 18).  At Step Two of the analysis, the ALJ found that Dameron had the following severe impairments:  degenerative disc disease of the lumbar spine with radiculopathy, mild osteoarthritis of the hips, degenerative disc disease of the thoracic spine status post discectomy (March 2007), and hypertension.[3]  (Tr. 18-19).  At Step Three, the ALJ found that Dameron's impairments, considered alone or in combination, did not meet or medically equal a listed impairment.  (Tr. 19-20).

The ALJ then assessed Dameron's residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work provided that she be able to sit and stand at will; avoid climbing, crawling, crouching, and kneeling; and perform other postural activities only on occasion.  (Tr. 20).

At Step Four, the ALJ determined that Dameron is unable to perform her past relevant work as a deli worker, bartender, or ramp loader because those jobs are semi-skilled work at the light to heavy exertional level and thereby exceed her RFC.  (Tr. 23).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Dameron is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 23-24).  Accordingly, the ALJ concluded that Dameron is not disabled under the Act.  (Tr. 24).

---

[3] Although the ALJ initially listed depression as a severe impairment, he made clear in his subsequent analysis that her "medically determinable mental impairment of depression . . . is . . . nonsevere" (Tr. 18-19) – a ruling which Dameron does not challenge.

14

### E.       Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (quotation marks omitted); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

15

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

> ### F.     Analysis

Dameron argues that the ALJ erred by failing to follow the "treating physician rule" in weighing the opinion of Dr. Bhardwaj, and also by failing to properly evaluate her credibility. As set forth below, this court agrees that the ALJ's assessment of Dr. Bhardwaj's opinion was inadequate, and recommends that (1) the case be remanded for the ALJ to revisit that assessment, and (2) the ALJ consider, on remand, the more developed record now available.

> #### 1.     *The ALJ Failed to Properly Apply the Treating Physician Rule to Dr. Bhardwaj's Opinion*

Dameron first contends that the ALJ erred by failing to follow the "treating physician rule" in weighing Dr. Bhardwaj's opinion.  In discussing his RFC assessment of Dameron, the ALJ noted that Dameron "received a significant amount of treatment" from Dr. Bhardwaj, who diagnosed her "with degenerative disc of both hips, and a bulging disc in her lower back."  (Tr. 22).  The ALJ then summarized (1) Dr. Bhardwaj's conclusion from his March 27, 2009, letter that Dameron would not be able to work for one full year due to her back and hip conditions, and (2) Dr. Bhardwaj's conclusions from his June 3, 2010 Multiple Impairment Questionnaire that Dameron had "lumbar radiculopathy, lumbar bilateral hip osteoporosis, depression,

16

hypertension, and chronic back pain with multi-level disc degeneration," that she "was only able to sit, stand, and walk for less than one hour and should get up and move around every fifteen to thirty minutes," that "she was able to lift up to five pounds occasionally, but should avoid postural activities," and that she "was unable to perform work full-time in a competitive job that required activity on a sustained basis, and was not even capable of low-stress jobs." (Tr. 22). The ALJ then stated that Dr. Bhardwaj's "opinion is given weight to the extent that it is consistent with the other medical evidence of record, however, the claimant has testified that she is able to lift and carry at least ten pounds and perform some household chores, although it now takes longer to perform those tasks." (Tr. 22).

The treating physician rule "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.").

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

17

give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(d)(2)). Those reasons "must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting S.S.R. 96-2p). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights" and "'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that []he is not.'" *Id.* at 937-38 (quoting *Wilson*, 378 F.3d at 544). The requirement also "safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the [treating physician] rule.'" *Id.* at 938 (quoting *Wilson*, 378 F.3d at 544).

Dameron argues that the ALJ's treatment of Dr. Bhardwaj's opinion falls short of this standard. This court agrees. The ALJ offers little to no insight into what weight he afforded Dr. Bhardwaj's opinion in his RFC assessment, and why. The ALJ states that he gave the opinion an unspecified amount of "weight to the extent that it is consistent with the other medical evidence of record," thereby suggesting that the opinion is, at least in part, inconsistent with some such evidence and not entitled to controlling weight. The ALJ then identifies two apparent inconsistencies between Dr. Bhardwaj's opinion and Dameron's testimony—that Dameron testified she could "lift and carry at least ten pounds," and that Dameron testified that she could "perform some household chores, although it now takes longer to perform those tasks." (Tr. 22). The ALJ offers no further explanation of what medical or other record evidence he deems inconsistent with Dr. Bhardwaj's opinion, and in what respects. Nor does he discuss how much

18

weight the opinion should receive in light of any such inconsistencies.

Some of this analysis can arguably be discerned by comparing Dr. Bhardwaj's opinion to the ALJ's RFC assessment and VE hypothetical.  The ALJ concluded that Dameron is capable of performing sedentary work[4] provided that she is allowed to sit and stand at will; avoid climbing, crawling, crouching, and kneeling; and perform other postural activities only on occasion.  (Tr. 20).  Correspondingly, the ALJ sought the VE's opinion regarding an individual who could lift or carry 10 pounds occasionally; who could stand, walk, and sit for six hours in an eight-hour workday provided she could sit and stand at will; who could push or pull 10 pounds; who could not engage in any climbing, crawling, crouching, or kneeling; and who could occasionally engage in other postural activities.  (Tr. 49-50).  Thus, the ALJ appears to have rejected at least the following aspects of Dr. Bhardwaj's assessment: that Dameron could sit for only 0-1 hour, and stand or walk for only 0-1 hour, during an eight-hour workday; that she would need to take unscheduled 15-20 minute breaks to rest at unpredictable intervals every 1-2 hours during an eight-hour workday; that she could only lift and carry up to five pounds occasionally; that she was unable to perform any postural activities; that she was incapable of even a low level of work stress; and that she would likely be absent from work more than three times per month.[5]

With the exception of the five-pound limitation on lifting and carrying, which the ALJ expressly rejected on the basis of Dameron's testimony, the ALJ does not discuss why he chose

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

[5] The ALJ also clearly rejected Dr. Bhardwaj's opinion that Dameron was "permanently disabled," but there is no dispute that the ALJ was not required to give any weight to this aspect of the doctor's opinion.  *See, e.g.*, *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010).

19

to reject these portions of Dr. Bhardwaj's opinion.  The ALJ points to Dameron's testimony regarding her limited performance of certain housework, but this court fails to see—and the ALJ fails to explain—how Dameron's admitted ability to slowly unload a dishwasher, sweep a floor over the course of a day, or perform other chores with the help of her mother and friends (Tr. 44-47), is necessarily inconsistent with Dr. Bhardwaj's opinion or supports the ALJ's departure from that opinion.  *See, e.g.*, *Rogers*, 486 F.3d at 248-49 (rejecting ALJ's emphasis of claimant's ability to perform "somewhat minimal daily functions" because those functions were "not comparable to typical work activities" and the ALJ "fail[ed] to examine the physical effects coextensive with their performance" or the fact that claimant "receive[d] assistance for many everyday activities and even personal care"); *Vanner v. Comm'r of Soc. Sec.*, No. 09-CV-12082, 2010 WL 3905835, at *4 (E.D. Mich. Sept. 28, 2010) (applying *Rogers* to ALJ's assessment of treating physician's opinion and claimant's credibility, and ordering remand).

Furthermore, it is not enough to identify reasons why a treating source's opinion may not merit controlling weight; the ALJ must then determine what weight to give it based on the factors set forth in 20 C.F.R. §§ 404.1527 (DIB) and 416.927 (SSI).  Aside from noting that Dameron "received a significant amount of treatment from" Dr. Bhardwaj (Tr. 22)—which would support giving that doctor's opinion more weight, not less, *see* 20 C.F.R. §§ 404.1527(c)(2)(i) & 416.927(c)(2)(i)—and identifying two apparent inconsistencies between the doctor's opinion and Dameron's testimony, the ALJ does not discuss these factors (such as the supportability of the opinion and Dr. Bhardwaj's level of specialization) or their impact on his assessment of the opinion's weight.  While the ALJ's decision need not always include "an exhaustive factor-by-factor analysis," *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011), "[b]alancing the[se] factors is required to satisfy the second prong of the

20

treating physician rule." *Cole*, 661 F.3d at 938.  The court is unable to discern from the ALJ's decision whether he adequately carried out this duty.

Attempting to fill these gaps, the Commissioner contends that Dr. Bhardwaj's opinion is inconsistent with other record evidence discussed in the ALJ's decision—namely, "the fact that [Dameron] had not completed physical therapy that may have alleviated her pain, the lack of any evidence supporting [Dameron]'s allegations of severe hip pain, and the fact that [Dameron]'s MRIs revealed only minor degenerative changes."  [11 at 9].  The Commissioner further argues that Dr. Bhardwaj's opinion was not well supported by clinical and diagnostic findings because "Dr. Bhardwaj never explained why his clinical findings of tenderness in [Dameron]'s spine and a painful range of motion in [her] hips required the extreme limitations that he identified in his opinions"; the surgeon who performed Dameron's back surgery "indicated that [Dameron]'s feelings of discomfort might be alleviated by physical therapy"; consulting physician "Dr. Tofaute observed no significant limitations in [Dameron]'s range of motion"; and the MRIs of Dameron's spine and hips only showed mild degenerative changes.  [11 at 10].  Lastly, the Commissioner contends that these deficiencies in Dr. Bhardwaj's opinion demonstrate that the § 404.1527 factors "militate against crediting Dr. Bhardwaj's opinions regarding the limiting effects of [Dameron]'s limitations," and additionally notes that "Dr. Bhardwaj, an internist, was not a specialist regarding [Dameron]'s spine and hip problems."  [11 at 11].

It may be that the ALJ shared the Commissioner's reasoning on these points, and discounted Dr. Bhardwaj's opinion accordingly; the problem, however, is that "it was the ALJ's job—not the Commissioner's task on appeal—to make th[is] requisite tie."  *Marthaler v. Comm'r of Soc. Sec.*, No. 11-cv-15315, 2012 WL 5265734, at *12 (E.D. Mich. Oct. 1, 2012), *adopted by* 2012 WL 5258639 (E.D. Mich. Oct. 24, 2012).  Here, the ALJ offered a string of

summaries of the medical evidence and opinions, but nothing to explain how they relate to his conclusion that Dr. Bhardwaj's opinion merited "weight to the extent that it is consistent with the other medical evidence of record."[6]   The court finds this inadequate.  *See, e.g.*, *Friend*, 375 F. App'x at 552 ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Wilson v. Comm'r of Soc. Sec.*, No. 12-10268, 2012 WL 6737766, at *9 (E.D. Mich. Nov. 19, 2012) ("The problem with the Commissioner's argument [that other evidence cited in ALJ's decision justifies the ALJ's assignment of little weight to treating physician's opinion] is that even though the ALJ cited evidence that was inconsistent with [that physician], the ALJ made no attempt to identify which of [that physician]'s findings were undermined by which evidence as plainly required by this Circuit.  It is not for the Court to undertake this analysis in the first instance." (citations omitted)), *adopted by* 2012 WL 6737764 (E.D. Mich. Dec. 28, 2012).

As the Sixth Circuit has repeatedly stressed, it is incumbent upon the ALJ to assess what weight a treating source's opinion deserves and to specifically articulate that weight and the "good reasons" supporting it; when the ALJ fails to do so, remand is appropriate.  *See, e.g.*, *Cole*, 661 F.3d at 938-39 (ordering remand when ALJ failed to assign a specific weight to a treating source's opinion or explain why part of that opinion was adopted while other parts were rejected because, "[w]hile it may be true that [the] opinion . . . should not ultimately be accorded controlling weight as to [claimant]'s RFC, the ALJ did not go through the required analysis to

---

[6] The ALJ's analysis of Dr. Tofaute's opinion was no more enlightening than that of Dr. Bhardwaj's opinion, comprising only a summary of the opinion's content and the ALJ's conclusion that "[t]his opinion is given weight to the extent that it is consistent with the other medical evidence of record."  (Tr. 22).

arrive at that conclusion"); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553-54 (6th Cir. 2011) ("[W]hen an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009)); *Friend*, 375 F. App'x at 551 (an ALJ's "failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record'" (quoting *Rogers*, 486 F.3d at 243)); *Wilson*, 378 F.3d at 546 (a reviewing court "cannot excuse the denial of a mandatory procedural protection simply because . . . there is sufficient evidence in the record of the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely" because this "would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory").

This court recognizes that "th[is] procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times,"  and that there may be cases "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation":

> [T]he procedural protections at the heart of the rule may be met when the "supportability" of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. . . . If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.

23

*Friend*, 375 F. App'x at 551 (internal quotation marks omitted); *see Cole*, 661 F.3d at 940.[7]  The

court, however, does not consider this to be the "rare case of the ALJ's analysis meeting the goal

of the rule even if not meeting its letter."  *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472

(6th Cir. 2006).   Aside from the minor inconsistency in Dameron's lifting and carry capacity

discussed above, the court does not see any "obvious[] conflict" between Dr. Bhardwaj's opinion

and the medical evidence discussed in the ALJ's decision, *id.* at 471, nor does that discussion

otherwise leave the court—or, more importantly, Dameron—with a "clear understanding" of

what weight the ALJ afforded the opinion and why.  *Cole*, 661 F.3d at 940; *see id.* ("It may be

true that, on remand, the Commissioner reaches the same conclusion as to [claimant]'s disability

while complying with the treating physician rule and the good reasons requirement; however,

[claimant] will then be able to understand the Commissioner's rationale and the procedure

through which the decision was reached.  The case must be remanded."); *Friend*, 375 F. App'x at

552 ("We are reviewing the . . . decision to see if it implicitly provides sufficient reasons for the

rejection of [the treating physician's] opinion . . . not merely whether it indicates that the ALJ did

reject [that] opinion." (quoting *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 464 (6th Cir.

2005))).

Accordingly, this court cannot conclude that the ALJ's error was harmless, and it must

instead recommend remanding the matter to the ALJ for proper application of the treating

physician rule to Dr. Bhardwaj's opinion.

---

[7] The Sixth Circuit has also indicated that an ALJ's error in applying the treating physician rule
may be deemed harmless if "a treating source's opinion is so patently deficient that the
Commissioner could not possibly credit it" or "if the Commissioner adopts the opinion of the
treating source or makes findings consistent with the opinion."  *Friend*, 375 F. App'x at 551
(quotation marks omitted).  This court finds neither circumstance present here.

2.      *Remand Under Sentence Four of U.S.C. § 405(g) Is Appropriate*

Dameron requests that the ALJ's decision "be reversed and remanded solely for a calculation of benefits" or, in the alternative, "remanded for further administrative proceedings." [9-1 at 17].   "Only when 'all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits' should a court reverse an ALJ's decision *and* immediately award benefits." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). Otherwise, the proper course is to remand the case to the ALJ.

In light of the analysis above, the court cannot conclude that all "essential factual issues have been resolved and the record adequately establishes [Dameron's] entitlement to benefits," *Faucher*, 17 F.3d at 176, and finds instead that remand under sentence four of 42 U.S.C. § 405(g) is necessary for further evaluation.  Furthermore, the court recommends that, on remand, the ALJ be ordered to consider the additional medical records submitted by Dameron to the Appeals Council, which include information regarding her hip pain and surgery and treatment at a pain clinic, as well as additional treatment records from Dr. Bhardwaj.  At the hearing, the ALJ indicated that such records "would be very helpful" in his determination (Tr. 55), and as discussed above, their absence influenced his RFC assessment—including, presumably, his evaluation of Dr. Bhardwaj's opinion, considering that it was "given weight to the extent that it [was] consistent with the other medical evidence of record" (Tr. 22).

Accordingly, while the ALJ certainly did not err in not considering evidence which was not before him, in revisiting the weight to afford Dr. Bhardwaj's opinion and, consequently, the RFC to assign to Dameron, the ALJ would seemingly be aided, without significant burden, by incorporating these records into his analysis.  *See, e.g.*, *Faucher*, 17 F.3d at 175 (on sentence-

four remand, court "may order the Secretary to consider additional evidence . . . to remedy a defect in the original proceedings" regardless of whether sentence-six criteria have been met); *Delong v. Comm'r of Soc. Sec.*, No. 11-14912, 2012 WL 7055988, at *6 (E.D. Mich. Nov. 29, 2012), *adopted by* 2013 WL 501625 (E.D. Mich. Feb. 11, 2013).[8]

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Dameron's Motion for Summary Judgment [9] be GRANTED IN PART, the Commissioner's Motion for Summary Judgment [11] be DENIED, and this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.


Dated: March 28, 2013                         s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to

---

[8] As noted, Dameron also challenges the ALJ's assessment of her credibility.  In light of the rulings above, the court need not resolve these challenges at this time, but in the interest of efficiency, the ALJ should, on remand, revisit that assessment in light of the additional records submitted by Dameron and provide a thorough explanation of his determination consistent with 20 C.F.R. § 404.1529(c) and S.S.R. 96-7p.

this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 28, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager